# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**PATRICIA ELWOOD,**

**Plaintiff,**

-vs-                                                        Case No.  6:09-cv-840-Orl-31GJK

**AT&T UMBRELLA BENEFIT PLAN NO.
1 - AT&T DISABILITY INCOME
PROGRAM and SEDGWICK CLAIMS
MANAGEMENT SERVICES, INC.,**

**Defendants.**

_____

# ORDER

This matter comes before the Court on the motions for summary judgment (Doc. 29, 33)

filed by, respectively, the Plaintiff, Patricia Elwood ("Elwood"), and by the Defendants, AT&T

Umbrella Benefit Plan No. 1, a component program – AT&T Disability Income Program ("DIP")

and Sedgwick Claim Management Services, Inc. ("Sedgwick").  The Court has also reviewed the

responses (Doc. 36, 37) filed by the parties, and Elwood's reply (Doc. 38) to the Defendants'

response.

**Background**

Except where noted, the following facts in this case are undisputed.  Elwood was employed

by an AT&T affiliate, BellSouth Telecommunications, Inc., as a property sales manager.  Through

this job, she was insured through the AT&T Disability Income Program (henceforth, the "Plan"),

which offered both short-term disability ("STD") and long-term disability ("LTD") benefits.  The

Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Sedgwick is the Plan's third party administrator.

On January 30, 2008, Elwood was injured in an automobile accident. In the wake of the accident, she began reporting symptoms such as migraines, speech disturbances, and memory loss. She made several efforts to return to work, but complained that injuries resulting from the accident prevented her from doing so. She was originally approved for STD benefits through February 26, 2008. Subsequently, she requested a number of extensions of the STD benefits, which Sedgwick granted, often after receiving additional information about Elwood's medical condition.[1] Her benefits were terminated effective July 21, 2008, by way of a letter dated July 28, 2008. The Defendants contend that the basis for doing so was a lack of updated medical data showing a continuing disability. (Doc. 33 at 2).

Elwood appealed the termination of benefits, saying that she was suffering debilitating neck and back pain, as well as psychological distress. On appeal, Elwood's medical documentation was reviewed by five independent physician advisors, who also consulted Elwood's health care providers. Each of the independent physician advisors informed Sedgwick that Elwood was not disabled.

After a review of the evidence, including the assessments of the independent physician advisors, Sedgwick upheld the termination of STD benefits. In addition, eligibility for LTD benefits under the Plan requires exhaustion of STD benefits. Because Elwood had not exhausted

---

[1] The first extension was granted through April 7, 2008; subsequently, extensions were granted through April 14; April 20; May 4; May 30; June 1; June 8l July 8; July 14; July 16; and July 21.

her STD benefits, Sedgwick determined that she was not eligible for LTD benefits.  Elwood now

challenges both of these determinations pursuant to 29 U.S.C. 1132(a)(1)(B).

### Summary Judgment Standards

A party is entitled to summary judgment when the party can show that there is no genuine

issue as to any material fact. Fed.R.Civ.P. 56©). Which facts are material depends on the

substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark

v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a

dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving

party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and

citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who

fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25.

The party opposing a motion for summary judgment must rely on more than conclusory statements

or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir.

1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most

favorable to the party opposing the motion, and resolve all reasonable doubts against the moving

party.  *Anderson*, 477 U.S. at 255.  The Court is not, however, required to accept all of the

non-movant's factual characterizations and legal arguments.  *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

**ERISA**

ERISA does not set out the standards by which a court is to review a plan administrator's decision to deny benefits.  *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 109, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989).  To fill this void, the Supreme Court has established two standards of review.  Where a plan administrator has no discretion to determine eligibility or to construe the terms of an ERISA-approved plan, courts review the benefit decisions *de novo*.  *Id.* at 115, 109 S.Ct. at 956.  Where the administrator exercises discretion in making such decisions, the court is to apply a deferential standard, reviewing the decision to determine whether it was arbitrary and capricious.  *Id.* at 111, 109 S.Ct. 954.  That determination is to be made based upon the facts as known to the plan administrator at the time the decision was made.  *Jett v. Blue Cross and Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989).  Within this Circuit, courts make those determinations within the following framework:

(1) Apply the *de novo* standard to determine whether the claims administrator's decision was  "wrong" – i.e., one with which the court disagrees.  If the Court finds that the decision was not wrong, the court ends the inquiry and affirms the decision.

(2) If the decision was "de novo wrong", determine whether the administrator was vested with discretion in making such decisions.  If it was not, reverse the decision.

(3) If the decision was wrong and the administrator was vested with discretion, determine whether reasonable grounds supported the decision – *i.e.*, whether the decision was arbitrary and capricious.

(4) If no reasonable grounds supported the decision, reverse it; if there were reasonable grounds supporting the decision, affirm it.

See *Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1356 (11th Cir. 2008). Until recently, upon determining that reasonable grounds existed for the decision, courts within the Eleventh Circuit were required to assess whether the plan administrator was operating under a conflict of interest at the time the decision was made. If no such conflict existed, the decision was to be affirmed. If there were such a conflict, the court was required to apply a "heightened" arbitrary and capricious standard of review to the decision. *See*, *e.g.*, *Williams v. BellSouth Telecomms, Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004). However, in *Doyle,* the court held that a recent Supreme Court decision – *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) – precluded application of a heightened standard. *Doyle*, 542 F.3d at 1359-60. As a result, the existence of any conflict of interest on the part of the administrator is now simply another factor to consider in determining whether the decision at issue was arbitrary and capricious. *Id.* at 1360.

**Did Sedgwick make any decisions that were "wrong"?**

For purposes of determining eligibility for STD benefits, the Plan defines "total disability" as follows:

> "Total Disability" or "Totally Disabled" for short-term disability means that because of illness or injury, you are unable to perform all of the essential functions of your job or another available job assigned by your Participating Company with the same full-time or part-time classification for which you are qualified.

Elwood was never assigned another job. (Doc. 29 at 23-24). Therefore, to determine that Elwood was disabled as of July 21, 2008, the Court would need to determine that her injuries made her "unable to perform all of the essential functions" of her job as of that date.

The parties disagree as to the proper interpretation of this phrase. The Defendants argue that, to have qualified as totally disabled, Elwood must have been unable to perform every single one of the essential functions of her job. Under this interpretation, if there were ten such functions, her ability to perform even one of them would mean that she was not disabled. Elwood argues that the definition requires the essential job functions to be considered collectively, so that she would be totally disabled unless she could perform all of those functions.

As used in the plan documents, the phrase "all of the essential functions" is ambiguous. Logic favors Elwood's interpretation. If a particular function is "essential" to a job, and an employee cannot perform it, it would seem to follow that the employee cannot do that job. The fact that the employee could perform other job requirements would not make up for it.[2]

_____

[2]The Defendants cite to two cases that allegedly support their interpretation, but the language utilized in those cases' plans was markedly different. The first such case is *Crossman v. Media General, Inc.*, 9 Fed. Appx. 147 (4th Cir. 2001). In *Crossman*, the plan defined disability, in pertinent part, as "the inability of a Participant to perform all of the customary duties of his position with the Company." *Id.* at 150. The *Crossman* court upheld the plan administrator's determination that an employee who could still perform some of his job's customary duties (and, in fact, had continued to do so) was not disabled. *Id.* at 151. But "customary" is not synonymous with "essential", and an employee who could do some of the customary duties (and *all* of the essential duties) would still be able to work.

The Defendants also contend that Sedgwick's interpretation is supported by the decision in *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262 (5th Cir. 2004). In that case, the plan paid LTD benefits to employees who were "unable to perform all of the material and substantial duties of [the employee's] occupation" because of injury or illness. *Id.* at 270. The *Ellis* court upheld the plan administrator's determination that to meet this definition, the employee had to be unable to perform *every single one* of those duties. *Id.* at 271. Again, "material and substantial" duties are not necessarily essential duties, and an inability to perform a single such duty would not necessarily

Thus, the Court finds that Elwood's interpretation is the better one. However, that this victory is of little assistance to Elwood, as she has not made a showing that she was disabled, or that Sedgwick made a wrong decision, under either interpretation.

Elwood contends that, as a result of the January 30, 2008 automobile accident, she suffered a concussion, plus injuries resulting in neck and back pain. As set forth in her motion for summary judgment, her main argument that the denial of benefits was wrong (as well as arbitrary and capricious) is that the Defendants failed to employ a neuropsychologist to review her claim. She asserts that her primary disabling condition was "closed head injury/post-concussive syndrome/post-traumatic brain injury" (hereinafter, "PTBI"). (Doc. 29 at 14). She argues that a closed head injury is diagnosed through neuropsychological testing, and that, after the denial of benefits, Sedgwick did not have her medical files reviewed by a neuropsychologist. Elwood argues that this failure to have the file reviewed by a neuropsychologist was a violation of ERISA regulations requiring that such appeals include a consultation with "a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. 2560.503-1(h)(3)(iii).

---

prevent an employee from working at a particular job. More importantly, the plan at issue in *Ellis* also had a provision for "partial disability," defined as an inability to perform "one or more, but not all, of the material and substantial duties of [the employee's] own or any other occupation". *Id.* at 272-73. The fact that the plan in *Ellis* established a category for employees who could do some but not all of the duties showed that the total disability category was intended to be limited to employees who could not do *any* of those duties. In the instant case, the Plan does not establish separate categories for employees who can perform some essential job functions and employees who cannot perform any essential job functions.

This argument suffers from a number of flaws.  The Defendants contend that Elwood's primary complaint prior to the termination of benefits was back and neck pain.  Elwood's contention that she was primarily complaining of symptoms relating to PTBI is supported only by her attorney's statement to that effect in a letter to Defendants dated January 15, 2009.[3]  Moreover, the record shows that Elwood did undergo neuropsychological testing prior to the termination of her STD benefits.  Although the tests indicated that she was suffering some ill effects as a result of the accident, such as cognitive deficiencies, she does not contend that any of those tests showed that she was unable to perform any essential function of her job.

She provides no backup for her assertion that *only* a neuropsychologist had the training and experience required to assess the existence or severity of her PTBI-related symptoms.  On the other hand, when Elwood appealed the denial of benefits, Sedgwick had her file reviewed by five medical professionals from different fields, including a psychologist and a neurologist.  None of those professionals concluded that she was disabled.  Elwood offers no evidence that a neuropsychologist would have reached a different conclusion.[4]

_____

[3]Within the letter, the statement is purportedly derived from a September 15, 2008 evaluation and treatment report by Steven R. Goll, M.D.  However, Elwood does not cite to that report itself, so the Court cannot review it to determine whether Dr. Goll made that determination, or whether he was simply repeating what Elwood had told him.  Moreover, the report language quoted in the attorney's letter describes the symptoms related to PTBI as "major problems," but not necessarily *the* major problem, or a disabling problem.  Notably, Elwood does not contend that any medical reports produced prior to the termination of benefits demonstrate that her primary concerns were the PTBI-related symptoms rather than, as the Defendants contend, back and neck pain.

[4]Elwood argues that one of the five professionals, Richard A. Silver, M.D., concluded that her file should be reviewed by a neuropsychologist.  (Doc. 29 at 15).  This is incorrect.  Silver, an orthopedic surgeon, concluded that Elwood was not disabled from an orthopedic standpoint – *i.e.,* that she did not have a disabling musculoskeletal problem – but stated that he would defer to a proper finding of disability from a neurologist, clinical psychologist, or clinical neuropsychologist.  (Doc. 29

Elwood also reports that she has undergone several rounds of neuropsychological testing since the termination of benefits, and that these tests indicate she was suffering from symptoms of PTBI, such as problems with orientation, spelling, and recall.  (Doc. 29 at 12-13).  However, Elwood does not argue that these tests (or anything else) led a medical professional to conclude that she was unable to perform even one essential function of her job on the date that her benefits were terminated, or subsequently.

Based on the foregoing, Elwood has failed to demonstrate the existence of a genuine issue of material fact as to whether the decision to terminate her benefits was wrong, or whether the failure to have her record reviewed by a neuropsychologist was wrong.[5]  Accordingly, the Defendants' decision must be affirmed.

**Conclusion**

In consideration of the foregoing, it is hereby

**ORDERED** that the motion for summary judgment (Doc. 29) filed by Patricia Elwood is **DENIED**.  And it is further

**ORDERED** that the Motion for Summary Judgment (Doc. 33) filed by the Defendants, AT&T Umbrella Benefit Plan No. 1, a component program – AT&T Disability Income Program

---

at 13-14).  He was not expressing an opinion that Elwood's file needed to be reviewed by any of those professionals.  He was simply indicating the limits of his area of expertise.  As noted above, Elwood's file was in fact reviewed by a neurologist and a psychologist.

[5]Elwood also challenges the decision to terminate benefits by asserting that there is no evidence to show that she was *not* disabled as of July 22, 2008, when benefits were halted.  (Doc. 29 at 16).  But that argument gets it backwards.  The plaintiff bears the burden of proving her entitlement to benefits.  *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998).  Standing alone, an absence of evidence that she was *not* disabled would not be enough to show that she was, in fact, disabled.

and Sedgwick Claim Management Services, Inc., is **GRANTED**.  The Clerk is directed to enter

judgment in favor of the Defendants and close the file.

      **DONE** and **ORDERED** in Chambers, Orlando, Florida on August 16, 2010.

 

_____
       **GREGORY A. PRESNELL**
     **UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record
Unrepresented Party